**YANKEE ATOMIC ELECTRIC COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 98–126C.

United States Court of Federal Claims.

Oct. 29, 1998.

Jerry Stouck, Washington, D.C., for plaintiff. Paul V. Waters, Robert L. Shapiro, and Glenn S. Greene, of counsel.

Joseph A. Kijewski, Assistant Director, Washington, D.C., with whom was Assistant Attorney General Frank W. Hunger, for defendant. Dow Davis, Department of Energy, of counsel.

## OPINION

MEROW, Judge.

This matter is before the court on defendant's motion to dismiss pursuant to Rule 12(b)(4) of the Rules of the United States Court of Federal Claims ("RCFC") and plaintiff's cross-motion for partial summary judgment pursuant to RCFC 56. At issue is a contract under which the defendant, the United States Department of Energy ("DOE"), promised to dispose of spent nuclear fuel and high-level radioactive waste (collectively "SNF") generated by the plaintiff, Yankee Atomic Power Co. ("Yankee"), in exchange for Yankee's payment of fees. Contract services were to begin not later than January 31, 1998. In the complaint, Yankee asserts that it has paid all the fees but DOE has not begun disposing of its SNF. Yankee alleges that DOE's inaction is a partial breach of the express and implied contract terms (Counts I–II); a taking of the property where Yankee's now-inoperative nuclear facility is located (Count III); and an illegal exaction of the SNF storage costs Yankee is incurring (Count IV). Yankee seeks a judgment of at least $70 million under each count.

Defendant has moved to dismiss the complaint on the ground that Yankee has not exhausted the administrative dispute resolution procedures mandated by the disputes clause of the contract. Plaintiff opposes the motion, contending that the disputes clause is inapplicable because Yankee's claims do not arise under the contract. Plaintiff has also cross-moved for partial summary judgment under Count I. Plaintiff asserts that it is entitled to judgment as a matter of law on the issue of contract liability because DOE's failure to begin SNF disposal services by January 31, 1998 is a clear breach of the express contract terms. Defendant opposes the motion, asserting that DOE's alleged delay in performance is cognizable and redressable under the contract and therefore cannot be a breach. Defendant also contends that factual issues as to whether DOE commenced contract services by January 31, 1998 preclude the entry of judgment in plaintiff's favor.

For the reasons stated below, it is concluded that Counts I–III of the complaint are not redressable under the contract and, as a result, the administrative procedures in the disputes clause are inapplicable. Therefore, defendant's motion to dismiss Counts I–III is denied. Defendant's motion to dismiss Count IV is granted, however, because Count IV fails to state a claim for which relief can be granted. Finally, it is concluded that DOE breached its contractual obligation to begin disposing of Yankee's SNF by January 31, 1998. Accordingly, plaintiffs cross-motion for summary judgment on the issue of liability under Count I is granted.

## I. BACKGROUND

Unless otherwise indicated, the following facts are undisputed. These facts are derived from the materials presented by the parties with respect to both pending motions.

### a. Background on Yankee

Yankee is a utility company whose only electricity-generating facility is a nuclear power plant located in Rowe, Massachusetts. The plant was shut down in 1991, and Yankee has taken steps to dismantle it and to return the site to unrestricted use. This process is substantially complete except for work dependent on the removal of about 127 metric tons of SNF generated during the plant's operation.

### b. Statutory Background

In 1982, Congress passed the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101–10270 (1994) ("NWPA" or "Act"), which establishes a comprehensive framework for disposing of SNF generated by civilian nuclear reactors. Congress identified four objectives in passing the NWPA: developing repositories to protect the public and the environment from the hazards of SNF; establishing federal responsibility and a federal policy for SNF disposal; defining the relationship between federal and state governments regarding SNF disposal; and establishing a Nuclear Waste Fund, composed of payments from generators and owners of SNF, to ensure that the federal government's costs of carrying out SNF disposal activities "will be borne by the persons responsible for generating such [SNF]." 42 U.S.C. § 10131(b).

Section 302(a)(1) of the NWPA authorizes the Secretary of DOE to enter into contracts with owners and generators of SNF under which DOE will accept, transport, and dispose of the SNF in exchange for the payment of fees. 42 U.S.C. § 10222(a)(1). Section 302(a)(5) sets forth certain contractual obligations which DOE must assume:

(5) Contracts entered into under this section shall provide that—

(A) following commencement of operations of a repository, the Secretary shall take title to the [SNF] involved as expeditiously as practicable upon the request of the generator or owner of such [SNF]; and

(B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the [SNF] involved as provided in this subchapter.

42 U.S.C. § 10222(a)(5).

The contract fees are established in Sections 302(a)(2) and (a)(3) of the Act. These provisions assess a one-time fee based on the amount of electricity generated in a nuclear power reactor prior to the effective date of the Act and an-ongoing fee based on the amount of such power generated thereafter. 42 U.S.C. § 10222(a)(2)-(3). Once the full amount due has been paid, the utility has no further financial obligation to the federal government for the disposal of its SNF. *Id.*

Pursuant to Section 302(c), DOE is directed to deposit fee payments, "immediately upon their realization," into a Nuclear Waste Fund established in the U.S. Treasury. 42 U.S.C. § 10222(c). DOE may make expenditures from the Waste Fund only for limited radioactive waste disposal activities listed in Section 302(d). 42 U.S.C. § 10222(d). Each year, DOE must review the fees collected to ensure that they cover the costs of the listed disposal activities. 42 U.S.C. § 10222(a)(4). If necessary to ensure a full cost recovery, DOE may, with the approval of Congress, adjust the contract fees. *Id.*

### c. Contract Provisions

On April 18, 1983, following notice and comment, DOE promulgated a Standard Contract for the Disposal of SNF ("Standard Contract") implementing Section 302 of the NWPA. 48 Fed.Reg. 16,590 (1983) (codified at 10 C.F.R. pt. 961). Article II, "Scope," sets forth the basic obligations assumed by DOE and the SNF owner or generator ("Purchaser"):

This contract applies to the delivery by Purchaser to DOE of [SNF] of domestic origin from civilian nuclear power reactors, acceptance of title by DOE to such [SNF], subsequent transportation, and disposal of such [SNF] and, with respect to such material, establishes the fees to be paid by the Purchaser for the services to be rendered hereunder by DOE. The [SNF] shall be specified in a delivery commitment schedule as provided in Article V below. The services to be provided by DOE under this contract shall begin, after commencement of facility operations,[1] not later than January 31, 1998 and shall continue until such time as all [SNF] . . . has been disposed of.

10 C.F.R. § 961.11, Art. II.

Article VIII, "Fees and Terms of Payment," establishes a one-time fee for SNF used to generate electricity before April 7, 1983. This fee "shall not be subject to adjustment." 10 C.F.R. § 961.11, Art. VIII ¶ 2. Article VIII also establishes an on-going fee for SNF used to generate electricity on or after April 7, 1983. *Id.* ¶ 1. DOE reserves the right to adjust this fee, with the approval of Congress, if necessary to ensure a full recovery of the costs of activities authorized by the NWPA. However, "[a]ny adjustment . . . shall be prospective." *Id.* ¶ 11.

Article IX, "Delays," provides:

*A. Unavoidable Delays by Purchaser or DOE*

Neither the Government nor the Purchaser shall be liable under this contract for damages caused by failure to perform its obligations hereunder, if such failure

---

1. A "DOE facility" is defined in the Standard Contract as "a facility operated by or on behalf of DOE for the purpose of disposing of [SNF], or such other facility(ies) to which [SNF] may be shipped by DOE prior to its transportation to a disposal facility." 10 C.F.R. § 961.11, Art. I ¶ 10.

arises out of causes beyond the control and without the fault or negligence of the party failing to perform. In the event circumstances beyond the reasonable control of the Purchaser or DOE—such as acts of God, or of the public enemy, acts of Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes and unusually severe weather—cause delay in scheduled delivery, acceptance or transport of [SNF], the party experiencing the delay will notify the other party as soon as possible after such delay is ascertained and the parties will readjust their schedules, as appropriate, to accommodate such delay.

*B. Avoidable Delays by Purchaser or DOE*

In the event of any delay in the delivery, acceptance or transport of [SNF] to or by DOE caused by circumstances within the reasonable control of either the Purchaser or DOE or their respective contractors or suppliers, the charges and schedules specified by this contract will be equitably adjusted to reflect any estimated additional costs incurred by the party not responsible for or contributing to the delay.

10 C.F.R. § 961.11, Art. IX.

Article XI, "Remedies," provides that "[n]othing in this contract shall be construed to preclude either party from asserting its rights and remedies under the contract or at law." 10 C.F.R. § 961.11, Art. XI.

Article XVI, "Disputes," establishes an administrative procedure for the resolution of controversies "arising under" the contract:

A. Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer ["CO"], who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Purchaser. The decision of the [CO] shall be final and conclusive unless within ninety (90) days from the date of receipt of such copy, the Purchaser mails or otherwise furnishes to the [CO] a written appeal addressed to the DOE Board of Contract Appeals (Board). The decision of

the Board shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith or not supported by substantial evidence. In connection with any appeal proceeding under this clause, the Purchaser shall proceed diligently with the performance of the contract and in accordance with the [CO]'s decision.

B. For Purchaser claims of more than $50,000, the Purchaser shall submit with the claim a certification that the claim is made in good faith; the supporting data are accurate and complete to the best of the Purchaser's knowledge and belief; and the amount requested accurately reflects the contract adjustment for which the Purchaser believes the Government is liable.

\* \* \* \*

D. This "Disputes" clause does not preclude consideration of law questions in connection with decisions provided for in paragraph A above; provided, however, that nothing in this contract shall be construed as making final the decision of any administrative official, representative, or board on a question of law.

10 C.F.R. § 961.11, Art. XVI.

Aside from the certification requirement for claims in excess of $50,000, Article XVI is substantively identical to the standard disputes clause used in government contracts before passage of the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1994) ("CDA"). *See, e.g.,* 41 C.F.R. § 1–7.102–12 (1977). DOE decided to adhere to the pre-CDA dispute resolution process after concluding that the CDA did not apply to contracts for services to be provided by the government. 48 Fed.Reg. at 16,595; *see* 41 U.S.C. § 602(a).

On June 22, 1983, Yankee and the government executed a Standard Contract for the disposal of SNF generated by Yankee's Rowe, Massachusetts facility. Yankee has paid all fees, totaling approximately $22.4 million, required by Article VIII of the con-

tract. DOE has not begun accepting, transporting, or disposing of Yankee's SNF.

#### d. Related Proceedings

In 1993, several states and utilities expressed concern about DOE's ability to begin disposing of SNF by January 31, 1998. On May 25, 1994, DOE responded by publishing a "Notice of Inquiry" in the Federal Register. 59 Fed.Reg. 27,007 (1994). DOE indicated that it would not be in a position to begin disposing of SNF by January 31, 1998 because a repository constructed in accordance with the NWPA would not be operational until, at the earliest, the year 2010. *Id.* at 27,008. DOE sought comments from affected parties on related issues, including the agency's preliminary view that it did not have a statutory obligation to accept SNF in 1998 in the absence of an operational, statutorily authorized repository or interim storage facility. *Id.* DOE also sought comments regarding use of the Waste Fund to offset "a portion of the financial burden that may be incurred by utilities in continuing to store [SNF] at reactor sites beyond 1998." *Id.* at 27,008–09.

On May 3, 1995, after reviewing comments, DOE published its "Final Interpretation of Nuclear Waste Acceptance Issues." 60 Fed. Reg. 21,793 (1995). The agency concluded definitively that "it does not have an unconditional statutory or contractual obligation to accept [SNF] beginning January 31, 1998 in the absence of a repository or interim storage facility constructed under the [NWPA]." *Id.* DOE also found that Section 302(d) of the Act did not permit use of the Waste Fund to help utilities defray the costs of storing SNF on-site beyond 1998. *Id.* at 21,797. However, the agency stated that if the NWPA were construed to unconditionally obligate it to begin disposal services by January 31, 1998, relief might be available under Article IX of the Standard Contract. *Id.*

Pursuant to Section 119 of the NWPA, a group of utilities and state agencies (not including Yankee) brought suit in the United States Court of Appeals for the District of Columbia Circuit challenging DOE's Final Interpretation. *See* 42 U.S.C. § 10139. In a decision issued July 23, 1996, the circuit court held that DOE's duty to begin SNF disposal services by January 31, 1998 was *not* conditioned on the existence of a repository or interim storage facility constructed under the NWPA and vacated the agency's Final Interpretation. *Indiana Michigan Power Co. v. United States Dep't of Energy*, 88 F.3d 1272 (D.C.Cir.1996). The court found that Section 302(a)(5)(B) of the Act required DOE to assume a contractual obligation, "reciprocal to the utilities' obligation to pay, to start disposing of the SNF no later than January 31, 1998." *Id.* at 1277. Aside from the utilities' payment of fees, the court held, DOE's obligation was "without qualification or condition." *Id.* at 1276. DOE did not request a rehearing or petition the U.S. Supreme Court for a writ of *certiorari*.

Following the *Indiana Michigan* decision, DOE notified Standard Contract holders and other interested parties that it would not begin accepting SNF by January 31, 1998 because it lacked a repository or interim storage facility constructed pursuant to the NWPA. The agency also made a preliminary determination that its inability to meet the January 31, 1998 deadline was an unavoidable, non-compensable delay under Article IX.A of the Standard Contract.

A number of utilities and state agencies, including Yankee, petitioned the circuit court for a writ of *mandamus* directing DOE to begin SNF disposal services by January 31, 1998. In an opinion issued November 14, 1997, the court granted the petition in part. *Northern States Power Co. v. United States Dep't of Energy*, 128 F.3d 754 (D.C.Cir.1997). The court reiterated its holding in Indiana Michigan that the NWPA "clearly demonstrates a congressional intent that [DOE] assume a contractual obligation to perform by the 1998 deadline, 'without qualification or condition.'" *Id.* at 758. The court also found that Article II of the Standard Contract fulfilled Congress' intent in this regard:

> DOE's duty to take the materials by the 1998 deadline is also an integral part of the Standard Contract, which provides that the Department "shall begin" disposing of the SNF by January 31, 1998. 10 C.F.R. § 961.11, Art. II. The contractual obligations created consistently with the statutory contemplation leave no room for DOE

to argue that it does not have a clear duty to take the SNF from the owners and generators by the deadline imposed by Congress.

*Id.* at 758–59.

Despite DOE's clear duty, the court declined to issue a broad writ directing the agency to begin taking SNF by January 31, 1998 because it found that a potentially adequate contractual remedy was available in the form of an equitable adjustment under Article IX.B. The court held that petitioners were required to pursue this remedy in the event of a delay. *Id.* at 759.

However, in order to effectuate its decision in Indiana Michigan, the court issued a writ of *mandamus* precluding DOE from continuing to excuse its failure to begin SNF disposal services by January 31, 1998 on the ground that it lacked an authorized repository or interim storage facility. *Id.* at 760–61. A consequence of this holding, the court stated, was that DOE "not implement any interpretation of the Standard Contract that excuses its failure to perform on the grounds of 'acts of Government in either its sovereign or contractual capacity.'" *Id.* at 760 (quoting 10 C.F.R. § 961.11, Art. IX.A). As a result, DOE maintains that it is prohibited from arguing that its failure to begin SNF disposal services is an unavoidable, non-compensable delay under Article IX.A of the Standard Contract.

Yankee and DOE petitioned the circuit court for a rehearing of the *Northern States* case. The petitions were denied in an unpublished order dated May 5, 1998. In September 1998, DOE petitioned the Supreme Court for a writ of *certiorari*. The Court has not yet acted on the petition. DOE has not moved to stay proceedings in this court pending the outcome of its petition.

### e. Proceedings Before the Court

On February 18, 1998, Yankee filed a four-count complaint in this court seeking a judgment of at least $70 million under each count. This figure consists primarily of the costs Yankee is incurring storing SNF at its inoperative facility. In Count I, Yankee asserts that DOE's failure to begin disposing of Yankee's SNF is a partial breach of Article II of the Standard Contract which, according to Yankee, imposes an unconditional obligation on DOE to begin disposal services by January 31, 1998. In Count II, Yankee asserts that DOE has breached the implied contractual duty of good faith and fair dealing by failing to dispose of Yankee's SNF despite the present capability to do so; failing to take appropriate steps to ensure that it would be in a position to begin disposal services by January 31, 1998; and otherwise unreasonably failing to perform its duties under the contract. In Count III, Yankee asserts that DOE's failure to begin disposal services amounts to a taking of Yankee's Rowe, Massachusetts property for which just compensation is due under the Fifth Amendment to the U.S. Constitution. Finally, in Count IV, Yankee asserts that DOE's failure to begin disposal services violates the NWPA and effects an illegal exaction of SNF storage costs from Yankee.

On June 4, 1998, defendant filed a motion to dismiss pursuant to RCFC 12(b)(4), asserting that the complaint does not state a claim for which relief can be granted. Defendant contends that the event giving rise to each of Yankee's claims—DOE's alleged delay in performance—is, at most, an avoidable delay under Article IX.B of the Standard Contract. Therefore, defendant reasons, Yankee has no valid breach, taking, or illegal exaction claim. Rather, Yankee has only a claim for an equitable adjustment under Article IX.B which it must pursue through the administrative procedures in the disputes clause before seeking relief in court.

On July 2, 1998, plaintiff filed its opposition and cross-motion for partial summary judgment. Plaintiff contends that defendant's motion to dismiss Count I must be denied because DOE's failure to begin SNF disposal services is a pure breach of Article II, not a "delay" cognizable under Article IX.B. Furthermore, plaintiff reasons, even if Article IX.B were applicable, it does not offer any relief in this case and therefore does not convert Yankee's breach claim into a claim arising under the contract. As a result, plaintiff asserts, Count I is not subject to administrative resolution under the disputes clause and is properly before the court.

Plaintiff also maintains that defendant's motion to dismiss Counts II–IV must be denied because those claims also are not cognizable or redressable under any contract clause. Finally, plaintiff contends that its cross-motion for summary judgment on the issue of liability under Count I must be granted because DOE's failure to begin SNF disposal services by January 31, 1998 is, as a matter of law, a breach of Article II.

Briefing was completed on August 13, 1998 and oral argument was held on September 16, 1998. Supplemental briefing on the issue of whether relief is available under the contract was completed on October 8, 1998.

## II. DISCUSSION

### a. Legal Background Regarding the Disputes Clause

As stated above, aside from the certification requirement for claims exceeding $50,-000, Article XVI of the Standard Contract is similar to the disputes clause used in government contracts before passage of the CDA. DOE decided to utilize the pre-CDA dispute resolution process after concluding that the CDA was inapplicable. Therefore, legal principles relating to the pre-CDA clause and dispute resolution process apply here and are summarized below.

The pre-CDA disputes clause establishes an administrative mechanism for adjudicating claims "arising under" the contract. Such claims must be submitted to the CO whose decision is final and conclusive unless appealed to the agency board of contract appeals ("board"). *E.g.*, 10 C.F.R. § 961.11, Art. XVI ¶ A. If the contractor is dissatisfied with the board's decision, only then may it seek relief in the proper court. *See Nager Elec. Co. v. United States*, 177 Ct.Cl. 234, 251–52, 368 F.2d 847, 859 (1966). The scope of judicial review is limited to the administrative record developed by the board. *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 714, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963). Under the Wunderlich Act, 41 U.S.C. §§ 321–22 (1994), the board's factual findings will not be disturbed unless shown to be fraudulent, arbitrary or capricious, so grossly erroneous as necessarily to imply bad faith,

or unsupported by substantial evidence. 41 U.S.C. § 321. The board's legal determinations are not entitled to finality, however, and must be resolved independently by the court. 41 U.S.C. § 322; 10 C.F.R. § 961.11, Art. XVI ¶ A; *Blake Constr. Co., Inc. v. United States*, 220 Ct.Cl. 56, 59, 597 F.2d 1357, 1359 (1979).

When a controversy "arises under" the contract, the contractor "must seek the relief provided for under the contract or be barred from any relief in the courts." *Crown Coat Front Co. v. United States*, 386 U.S. 503, 512, 87 S.Ct. 1177, 18 L.Ed.2d 256 (1967); *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 402, 422 n. 22, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). This is because the administrative mechanism in the disputes clause "is exclusive in nature. Solely through its operation may claims be made and adjudicated as to matters arising under the contract." *United States v. Joseph A. Holpuch Co.*, 328 U.S. 234, 239–40, 106 Ct.Cl. 852, 66 S.Ct. 1000, 90 L.Ed. 1192 (1946). An exception is made only if it clearly appears that the administrative procedures are "inadequate or unavailable"—when, for example, the CO or the board "so clearly reveals an unwillingness to act and to comply with the administrative procedures in the contract that the contractor or supplier is justified in concluding that those procedures have thereby become 'unavailable.'" *United States v. Anthony Grace & Sons, Inc.*, 384 U.S. 424, 429–30, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966).

A controversy "arises under" the contract and is subject to the disputes clause "to the extent complete relief is available under a specific provision of the contract." *Edward R. Marden Corp. v. United States*, 194 Ct.Cl. 799, 804, 442 F.2d 364, 366–67 (1971). "A corollary principle is that, to the extent complete relief is not made available under a specific contract provision, a controversy is not subject to administrative determination via the Disputes clause and may be tried de novo in the proper court." *Id.* at 805, 442 F.2d at 367; *Utah Constr.*, 384 U.S. at 402, 412, 86 S.Ct. 1545.

"Complete relief" means a reasonably adequate substitute for the damages available in a breach action. *See William Green Constr.*

*Co., Inc. v. United States,* 201 Ct.Cl. 616, 622–26, 477 F.2d 930, 934–37 (1973) (contractor does not retain breach claim for improper default termination where convenience termination award available under contract provides "a full and permissible substitute for the award of damages under the former 'breach' claim"), *cert. denied,* 417 U.S. 909, 94 S.Ct. 2606, 41 L.Ed.2d 213 (1974); *Chaney & James Constr. Co. v. United States,* 190 Ct. Cl. 699, 706–07, 421 F.2d 728, 732 (1970) (where contract clause is intended as substitute for action at law for breach, "the contractor should be entitled to get the same relief under the clause that he could get in the absence of the clause if he sued for breach of contract"); *Gregory Lumber Co. v. United States,* 9 Cl.Ct. 503, 517 (a claim arises under the contract "when there is a specific contractual clause through which the contractor can get 'all the relief to which it is entitled and asks'") (quoting *Zidell Explorations, Inc. v. United States,* 192 Ct.Cl. 331, 334, 427 F.2d 735, 737 (1970)). A contract provision affording complete relief serves to convert a breach claim into a claim "arising under" the contract and subject to the disputes clause. *Utah Constr.,* 384 U.S. at 404 n. 6, 418, 86 S.Ct. 1545; *Len Co. & Assocs. v. United States,* 181 Ct.Cl. 29, 36, 385 F.2d 438, 442 (1967); *Gregory Lumber Co.,* 9 Cl. Ct. at 517–18.[2]

### b. Defendant's Motion to Dismiss Count I

"The grant of a motion to dismiss for failure to state a claim upon which relief may be granted is appropriate where the plaintiff cannot assert a set of facts that supports its claim." *New Valley Corp. v. United States,* 119 F.3d 1576, 1579 (Fed.Cir.1997); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In ruling on the motion, the court must assume the well-pled factual assertions in the complaint are true and make all reasonable inferences in plaintiff's favor. *New Valley,* 119 F.3d at 1580.

Defendant contends that Count I must be dismissed because it alleges, at most, an avoidable delay arising under Article IX.B of the contract. Therefore, defendant reasons, plaintiff must exhaust the administrative procedures in the disputes clause before seeking relief in court. Plaintiff responds that Article IX.B applies only to delays in *ongoing* performance, such as an unexpected problem with the DOE train or truck being used for SNF transport. As a result, plaintiff asserts, the clause does not encompass Count I which alleges that DOE failed to even begin SNF disposal services by the January 31, 1998 deadline.

▮ "Contract interpretation begins with the plain language of the agreement." *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991). "A contract is read in accordance with its express terms and the plain meaning thereof." *C. Sanchez and Son, Inc. v. United States,* 6 F.3d 1539, 1543 (Fed.Cir.1993). "Where contract provisions are clear and unambiguous, they must be given their plain and ordinary meaning." *Alaska Lumber & Pulp Co., Inc. v. Madigan,* 2 F.3d 389, 392 (Fed.Cir.1993).

Article IX.B, "Avoidable Delays by Purchaser or DOE," provides:

In the event of any delay in the delivery, acceptance or transport of [SNF] to or by DOE caused by circumstances within the reasonable control of either the Purchaser or DOE or their respective contractors or suppliers, the charges and schedules specified by this contract will be equitably adjusted to reflect any estimated additional costs incurred by the party not responsible for or contributing to the delay.

10 C.F.R. § 961.11, Art. IX.B. The plain language of the clause covers "any delay" in acceptance of SNF by DOE. "Any" is a common term defined as "some, no matter how much or how little, how many, or what kind." *Webster's New World Dictionary* 62 (3d College ed.1988). "Delay" is also an ordinary term meaning "to put off to a future time; postpone." *Id.* at 364. Plaintiff does

---

**2.** The CDA abolished the disparate treatment of breach claims and claims "arising under" the contract by requiring that all claims "relating to a contract" be submitted to the CO for decision. 41 U.S.C. § 605(a). A contractor dissatisfied with the CO's decision on any claim, breach or otherwise, can appeal either to this court or the relevant board where the claim will be reviewed *de novo.* 41 U.S.C. §§ 606–07, 609(a).

232

not allege that DOE will never fulfill its obligation to accept Yankee's SNF. Rather, the agency has stated that it is going to postpone its obligation until 2010, when it anticipates having an SNF repository constructed and licensed under the NWPA. While this delay in acceptance is certainly long, it falls under the plain, broad language in Article IX.B.[3] Therefore, Article IX.B will convert Yankee's breach claim into a claim arising under the contract if an adjustment is available under the clause which affords Yankee complete relief.

Defendant contends that since DOE's alleged postponement of its disposal obligations under Article II is cognizable as an avoidable delay under Article IX.B, it cannot give rise to a separate breach claim which would entitle Yankee to common law damages. Therefore, defendant argues, the determination of whether Article IX.B affords Yankee complete relief for its nonexistent breach claim is "nothing more than a meaningless exercise." Yankee is entitled solely to the remedy it agreed to in Article IX.B, defendant reasons, regardless of how limited it may be.

■ This contention must be rejected. The presence of a limited contractual remedy for a breach does not automatically bar a court action for additional relief unless the parties clearly agreed that the contractual remedy would be exclusive. For instance, it has consistently been held in delay cases that "when only partial relief is available under the contract—e.g., an extension of time . . .— the remedies under the contract are not exclusive and the contractor may secure damages in breach of contract if the Government's conduct has been unreasonable." *Utah Constr.*, 384 U.S. at 402, 86 S.Ct. 1545 (citing *Kehm Corp. v. United States*, 119 Ct.Cl. 454, 93 F.Supp. 620 (1950), and *George A. Fuller Co. v. United States*, 108 Ct.Cl. 70, 69 F.Supp. 409 (1947)).[4]

■ Similarly, in *Koppers/Clough v. United States*, 201 Ct.Cl. 344 (1973), the contract indicated that a pier would be available for the contractor's use and the government implicitly promised not to prevent its timely availability. The pier was not ready until well after contract performance began and the contractor sought to recover, under the contract and in court, the costs incurred as a result of the delay. The applicable clause stated that, in the event of a delay, "the Government shall only be liable to make an equitable adjustment under [the Changes clause] for changes in the property furnished." *Id.* at 350 n. 4, 201 Ct.Cl. 344. Since no changes had been made to the pier, both the board and the court held that the clause afforded the contractor no relief. However, the court found that the contractor

---

**3.** In an attempt to avoid the plain language of the clause, plaintiff contends that Article IX.A establishes a distinction between a "failure to perform" and a "delay" which must be carried over into Article IX.B. Since Article IX.B refers only to a delay, plaintiff argues, it was not intended to cover the distinct concept of a failure to perform which is alleged in Count I. However, while Article IX.A, quoted above, uses the terms "failure to perform" and "delay," it does not "distinguish" between them. Rather, the terms are used interchangeably and a straightforward reading of the clause conveys the common-sense notion that a "failure to perform" can include a "delay," which can also be described as a failure to perform on time, a failure to perform in accordance with the schedule, etc.

**4.** A contractor is required to prove that the government's conduct has been "unreasonable" when it alleges a breach of either the implied duty not to hinder or unreasonably delay performance or the implied duty of good faith and fair dealing. *See Kehm Corp.*, 119 Ct.Cl. at 469, 93

F.Supp. at 623; *George A. Fuller Co.*, 108 Ct.Cl. at 94–96, 69 F.Supp. at 411–12; *Koppers/Clough v. United States*, 201 Ct.Cl. 344, 361–63 (1973); *Commerce Int'l Co. v. United States*, 167 Ct.Cl. 529, 535–36, 338 F.2d 81, 85–86 (1964). In contrast, where a breach of an express, unconditional obligation to perform by a certain date is alleged, the contractor need only prove that the promise has not been fulfilled by the date specified. *See Specialty Assembling & Packing Co., Inc. v. United States*, 174 Ct.Cl. 153, 156–62, 355 F.2d 554, 558–60 (1966) (where government promised to deliver materials by specific date, failure to do so is breach despite unforseen difficulties which hindered performance); *National Steel & Shipbuilding Co. v. United States*, 190 Ct.Cl. 247, 258–59, 419 F.2d 863, 870 (1969) (where contract contains unqualified promise to deliver material by specific date, "[t]he failure to deliver on time, without more, is a breach"); *Abbett Elec. Corp. v. United States*, 142 Ct.Cl. 609, 614–16, 162 F.Supp. 772, 775–76 (1958); *Torres v. United States*, 126 Ct.Cl. 76, 78, 112 F.Supp. 363, 364–65 (1953).

retained a claim for breach damages beyond the limited remedy available under the clause because it did not

> stipulate that the administrative provisions for adjustment are exclusive or that the Government shall not be liable for suit for breach of contract.... The language at the end of the provision limits only the Government's liability "to make an equitable adjustment", nothing more. It is not the sweeping exculpation present in other cases. Although the parties may have provided merely a restricted, not a comprehensive, remedy 'under the contract', the Government's substantive obligation remains intact and can be enforced by the courts.

201 Ct.Cl. at 356 (internal citations omitted); *see also Cedar Lumber, Inc. v. United States,* 5 Cl.Ct. 539, 552 (1984) ("When the government intends to disclaim liability for breach of contract, it must employ clear and express language to effectuate its intent.").[5]

Article IX.B does not purport to be an exclusive remedy, nor does it contain any language limiting either party's liability for avoidable delays which constitute a breach of the contract. This omission stands in stark contrast to Article IX.A, where the parties expressly agreed that, in the event of an unavoidable delay, "[n]either the Government nor the Purchaser shall be liable under this contract for damages." 10 C.F.R. § 961.11, Art. IX.A. Since the parties chose not to include such language in Article IX.B, Yankee retains a valid breach claim redressable in court if Article IX.B offers only limited relief.

This conclusion is further mandated by Article XI, "Remedies," which provides that "[n]othing in this contract shall be construed to preclude either party from asserting its rights and remedies under the contract *or at law.*" 10 C.F.R. § 961.11, Art. XI (emphasis added). Similar language in the standard

default clause has been held to preserve the government's right to pursue common law breach damages if the contractual remedies for default are unavailable or incomplete. *Rumley v. United States,* 152 Ct.Cl. 166, 285 F.2d 773 (1961); *Marley v. United States,* 191 Ct.Cl. 205, 223–24, 423 F.2d 324, 334–35 (1970); *Astro–Space Labs., Inc. v. United States,* 200 Ct.Cl. 282, 311–12, 470 F.2d 1003, 1019–20 (1972).

For instance, in *Rumley,* the default article entitled the government to recover excess reprocurement costs from the defaulted contractor but also stated that "[t]he rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under the contract." 152 Ct.Cl. at 171, 285 F.2d at 777. After the board held that relief was unavailable under the contract because the government had not awarded new contracts within a reasonable time after notice of termination, the government sought to recover breach damages in court. The court held that the language of the default article quoted above "reserved to the [government] any common law remedies which it may have had, at the same time recognizing the right to assert claims for excess cost under [the default clause]." *Id.* The court stated that the government "should be given the opportunity to show, as a matter of common law contract damages, how much the cost of obtaining performance was increased as a result of the plaintiff's breach." *Id.* at 172, 285 F.2d at 777; *see also Tester Corp. v. United States,* 1 Cl.Ct. 370, 376 (1982) (interpreting similar default clause, court held that even if the government recovers excess costs under the contract following a default termination, "it would not be precluded from seeking in a judicial action additional costs it incurred as a result of plaintiff's breach").

Admittedly, the language in the default clause at issue in *Rumley* is not identical to

---

5. This is consistent with the prevailing rule applied to contracts between private parties. For instance, Section 2–719 of the Uniform Commercial Code provides that contracting parties may agree to limit the remedies available in the event of a breach, but resort to those remedies is optional "unless the remedy is expressly agreed to be exclusive, in which case it is the sole

remedy." UCC § 2–719(1)(b). This section "creates a presumption that clauses prescribing remedies are cumulative rather than exclusive. If the parties intend the term to describe the sole remedy under the contract, this must be clearly expressed." *Id.* cmt. 2; *see also* 17A Am.Jur.2d *Contracts* 748 (1991).

the language in Article XI of the Standard Contract. However, since Article IX.B does not purport to be an exclusive remedy, and since the parties specifically agreed in Article XI that nothing in the contract would preclude them from asserting their rights and remedies at law, the effect is the same. If it is shown that DOE's delay breached the contract, and Article IX.B does not afford Yankee complete relief, Article XI preserves Yankee's right to pursue remedies at law which are unavailable under the contract. Accordingly, Article IX.B will wholly subsume Yankee's cause of action and convert its breach claim into a claim arising under the contract only if complete relief is available under the clause.

In the event of an avoidable delay by DOE, Article IX.B entitles a purchaser to an equitable adjustment to the contract charges "to reflect *any* estimated additional costs incurred." 10 C.F.R. § 961.11, Art. IX.B (emphasis added).[6] Without a doubt, this broad language would encompass all of the SNF storage costs Yankee seeks in Count I as a result of DOE's alleged delay. As stated above, "any" is a broad term which means "some, no matter how much or how little, how many, or what kind." *Webster's New World Dictionary, supra,* at 62. Therefore, when an adequate adjustment to the contract charges is available under Article IX.B, it may indeed provide a purchaser with complete relief for DOE's alleged breach.

**6.** Article IX.B also provides for an adjustment to the contract schedule. However, since DOE does not anticipate commencing disposal services until the year 2010, there is presently no schedule to adjust.

**7.** DOE has not retreated from its Final Interpretation in this regard. Nor did it offer, in response to a request from the court, any explanation of how Yankee's fully-paid charges could be adjusted in light of the contract and statutory provisions discussed above. Instead, the agency states that this issue must be decided by the CO in response to a certified claim. However, the court can and must decide the legal issue of whether an adjustment is available under the contract in order to rule on defendant's motion. *See Edward R. Marden Corp.,* 194 Ct.Cl. at 804–05, 442 F.2d at 366–67; *Blake Constr. Co.,* 220 Ct.Cl. at 59, 597 F.2d at 1358.

Despite the agency's refusal to comment, counsel for defendant did offer his personal speculation that DOE perhaps could pay for contract adjustments from sources other than the Waste

In this case, however, an adjustment to the contract charges is unavailable. Article VIII of the Standard Contract provides that the one-time fee for SNF used to generate electricity prior to April 7, 1983 "shall not be subject to adjustment." 10 C.F.R. § 961.11, Art. VIII ¶ 2. The clause also states that "[a]ny adjustment" to the post-April 7, 1983 fees "shall be prospective." *Id.* ¶ 4. Thus, the contract permits only a prospective adjustment to the post-April 7, 1983 fees. Since Yankee has already paid all of these fees (in addition to its entire pre-April 7, 1983 fee), no adjustment is available under the contract.

Furthermore, statutory restrictions on the use of contract payments preclude DOE from retroactively adjusting Yankee's charges to reflect its on-site storage costs. Under Section 302(c) of the NWPA, DOE was required to immediately deposit Yankee's fee payments into the Waste Fund. 42 U.S.C. § 10222(c). DOE's authority to make expenditures from the Waste Fund is restricted to specific listed activities. 42 U.S.C. § 10222(d). As the agency itself recognized in its May 3, 1995 Final Interpretation, the list does not include "[p]aying for the costs of on-site storage." 60 Fed.Reg. at 21,797. Therefore, the Act "does not provide for use of the Nuclear Waste Fund to help utilities defray costs of on-site storage." *Id.*[7]

Fund, "if available." For instance, counsel pointed out that DOE could decide to seek an appropriation from Congress for this purpose. However, defendant, as the moving party, "has the burden of proving that no claim has been stated." 2 James Wm. Moore, *Moore's Federal Practice* 12.34 at 12–56 (3d ed.1998). Counsel's personal speculation, not necessarily reflecting the agency's position, about theoretical funding sources which have not been identified and potential future appropriations which have been not sought does not discharge this burden. More importantly, Article IX.B provides only for an adjustment to the contract "charges." Yankee has paid all the charges, and DOE's conclusion that it cannot refund them to defray Yankee's on-site storage costs is in accord with the statutory language. Since no adjustment to the contract charges can be made, no relief is available *under the contract.* Whether relief could be provided by some extra-contractual means is immaterial to defendant's motion because it is a matter beyond the scope of the disputes clause.

Since no adjustment to the contract charges is available in these circumstances, Yankee's breach claim is not redressable, either in whole or in part, under Article IX.B. As a result, the clause does not convert Yankee's breach claim into a claim "arising under" the contract and subject to the disputes clause. Count I alleges a pure breach claim for which relief may be granted by this court. 28 U.S.C. § 1491(a)(1). Defendant's motion to dismiss Count I is therefore denied.

### c. Plaintiff's Motion for Partial Summary Judgment Under Count I

Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to prevail as a matter of law. RCFC 56(c); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987). The movant "bears the burden of demonstrating the absence of genuine issues of material fact." *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575 (Fed.Cir.1994).

Plaintiff asserts that it is entitled to summary judgment on the issue of liability under Count I because DOE has, as a matter of law, breached its express, unconditional obligation in Article II to begin disposing of Yankee's SNF by January 31, 1998. Defendant responds that since DOE's failure to begin disposal services on time is cognizable as a delay under Article IX.B, it cannot be a breach. Defendant also contends that issues of fact as to whether DOE commenced contract services by January 31, 1998 preclude the entry of judgment in plaintiff's favor. Defendant relies on the declaration of Mr. Lake H. Barrett, DOE's Acting Director of the Office of Civilian Radioactive Waste Management, who attests that DOE has expended significant efforts developing a site suitable for an SNF repository. Mr. Barrett also states that DOE has discussed its delay with contract holders and the public and has issued an annual acceptance priority ranking for receipt of SNF.

In the *Indiana Michigan* decision, which DOE did not appeal, it was held that Section 302(a)(5)(B) of the NWPA "mandates that DOE assume a contractual obligation to start disposing of the SNF by January 31, 1998." *Northern States*, 128 F.3d at 757 (summarizing holding in *Indiana Michigan*). Aside from the utilities' payment of fees, DOE's obligation was held to be "without qualification or condition." *Indiana Michigan*, 88 F.3d at 1276.

Article II of the Standard Contract implements Section 302(a)(5)(B). It lists the essential contract services DOE is to provide, *i.e.*, acceptance, transportation, and disposal of SNF, and states that these services "shall begin" not later than January 31, 1998. 10 C.F.R. § 961.11, Art. II. DOE has not offered any valid argument demonstrating that the duties created by Article II differ in any way from those required by Section 302(a)(5)(B). It is therefore concluded that Article II, when construed in accordance with the statutory mandate it is intended to implement, imposed a duty on DOE, conditioned only on Yankee's payment of fees, to begin accepting, transporting, and disposing of Yankee's SNF by January 31, 1998.

 "Failure to perform a contractual duty when it is due is a breach of the contract." *Winstar Corp. v. United States*, 64 F.3d 1531, 1545 (Fed.Cir.1995), *aff'd*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996); *see supra* n. 4. It is undisputed that Yankee has paid all the contract fees and, notwithstanding Mr. Barrett's declaration, it is also undisputed that DOE has not begun accepting, transporting, and disposing of Yankee's SNF. Accordingly, DOE has breached the contract.

Defendant argues that since DOE's nonperformance is cognizable as an avoidable delay under Article IX.B it cannot be a breach. As stated above, if an adjustment is available under Article IX.B, it certainly may convert a purchaser's breach *claim* into a claim arising under the contract. But neither Article IX.B nor any other clause gave DOE the right to unilaterally postpone its unconditional obligations under Article II.[8]

---

8. In Article X, "Suspension," DOE did reserve the right to "suspend this contract or any portion

thereof" if Yankee failed to perform and to "suspend any scheduled deliveries in the event that a

Therefore, DOE's failure to begin disposal services by January 31, 1998 remains an unauthorized breach of Article II even though it is cognizable as an avoidable delay and may, in some cases, be redressable under Article IX.B. *See George A. Fuller Co.,* 108 Ct.Cl. at 101, 69 F.Supp. at 415 (government "is liable for any delay except one caused *by the exercise of a reserved right* or one brought about by an act of God, of the law, or the other party") (emphasis added).[9]

Accordingly, there are no genuine issues of material fact. Plaintiff is entitled to judgment, as a matter of law, on the issue of liability under Count I. Therefore, plaintiff's cross-motion for partial summary judgment is granted.

### d. Defendant's Motion to Dismiss Count II

██ Every contract implicitly obligates each party to perform its duties reasonably and in good faith. *See Asco–Falcon II Shipping Co. v. United States,* 18 Cl.Ct. 484, 491–92 (1989). In Count II, Yankee asserts that DOE breached this obligation by willfully and deliberately refusing to take Yankee's SNF despite its ability to do so, unreasonably failing to take steps to ensure that performance would begin by January 31, 1998, and otherwise unreasonably failing to perform its duties under the contract. Defendant has moved to dismiss Count II on the ground that it alleges an avoidable delay contemplated by and redressable under Article IX.B and Article XVI.

██ Neither Article IX.B nor any other contract clause purports to cover or redress a breach of the implied duty of good faith and fair dealing. As a result, Count II does not arise under the contract and is not subject to administrative resolution under the disputes clause. *See Gregory Lumber,* 9 Cl. Ct. at 520 (claims based on breach of implied duty cognizable only as breach claims because "in no clause of plaintiff's five contracts is any attempt made to define a remedy for the failure of a party to have acted in good faith."). Defendant's motion to dismiss Count II is denied.

### e. Defendant's Motion to Dismiss Count III

██ In Count III, Yankee asserts that DOE's failure to dispose of its SNF amounts to a taking of the real property on which its inoperative facility is located. Yankee seeks just compensation for the alleged taking under the Fifth Amendment to the U.S. Constitution. Defendant argues that Count III must be dismissed because Yankee has not processed its claim through the administrative procedures in the disputes clause. However, no contract clause purports to cover or redress an alleged taking of real property. Therefore, plaintiff's taking claim is not converted into a claim arising under the contract and subject to the disputes clause. Defendant's motion to dismiss Count III is denied.

### f. Defendant's Motion to Dismiss Count IV

In Count IV, Yankee asserts that DOE's failure to begin disposing of Yankee's SNF by January 31, 1998 violates the NWPA and effects an illegal exaction of SNF storage costs from Yankee. Defendant contends that Count IV must be dismissed because Yankee has failed to seek a remedy under the contract and has yet to be denied just compensation for the asserted illegal exaction. Defendant also contends that, to the extent Yankee is seeking to recover its contract payments, those payments were not illegally exacted

---

national emergency requires that priority be given to Government programs to the exclusion of the work under this contract." 10 C.F.R. § 961.11, Art. X. However, defendant does not argue, and the record does not reflect, that either condition applies here. In addition, while Article XV, "Amendments," does permit changes to the contract terms, both parties must agree to the changes. 10 C.F.R. § 961.11, Art. XV.

9. *See also Chaney and James Constr. Co.,* 190 Ct.Cl. at 706, 421 F.2d at 732 ("In the absence of

a contract clause giving the Government the right to suspend the contractor's work or otherwise delay the contractor's performance, a work stoppage caused by the Government would ordinarily be a breach of contract giving rise to an action at law for damages, but a suspension of work caused by the Government is not a breach of contract when done pursuant to a right granted to the Government by the terms of the contract itself.") (citation omitted).

because they were paid pursuant to the terms of the contract.

██ "Illegal exaction jurisdiction will lie in cases where a 'plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum' that 'was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation.'" *Bowman v. United States,* 35 Fed. Cl. 397, 400 (1996) (quoting *Eastport S.S. Corp. v. United States,* 178 Ct.Cl. 599, 605, 372 F.2d 1002, 1007–08 (1967)). "If [plaintiff] made payments that by law the [government] was obligated to make, the government has 'in its pocket' money corresponding to the payments that were the government's statutory obligation. Suit can be maintained under the Tucker Act for recovery of the money illegally required to be paid on behalf of the government." *Aerolineas Argentinas v. United States,* 77 F.3d 1564, 1573–74 (Fed.Cir.1996).

██ Yankee's illegal exaction claim fails because the duty on which the claim is based is contractual, not statutory. Section 302(a)(5)(B) of the NWPA directed DOE to assume a *contractual* obligation to begin disposing of SNF by January 31, 1998. 42 U.S.C. § 10222(a)(5). As discussed above, DOE has done so through Article II of the Standard Contract. Therefore, while DOE's failure to begin disposing of Yankee's SNF breaches Article II, it does not violate any statutory duty. Thus, Yankee's post–1998 storage costs cannot be recovered on an illegal exaction theory. Defendant's motion to dismiss Count IV is granted.

## CONCLUSION

Based on the foregoing, it is hereby **ORDERED:**

(1) Defendant's June 4, 1998 Motion to Dismiss Pursuant to RCFC 12(b)(4) is **GRANTED** to the extent it seeks dismissal of Count IV of the complaint. Defendant's motion is otherwise **DENIED.** When final judgment is entered by the Clerk in this matter, it shall reflect the dismissal of Count IV;

(2) Plaintiff's July 2, 1998 Cross–Motion for Summary Judgment on Contract Liability is **GRANTED;** and

(3) A Pretrial Order will be entered shortly scheduling further proceedings in this matter.