225 F.3d 1336 (Fed. Cir. 2000)
 MAINE YANKEE ATOMIC POWER COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY, AND YANKEE ATOMIC ELECTRIC COMPANY,PLAINTIFFS-APPELLEES,
V.
UNITED STATES,DEFENDANT-APPELLANT.
 No. 99-5138,-5139,-5140
 U.S. Court of Appeals, Federal Circuit
 August 31, 2000
 
 Appealed from: United States Court of Federal Claims Senior Judge James F. MerowJerry Stouck, Spriggs & Hollingsworth, of Washington, Dc, argued for plaintiffs-appellees. Of counsel on the brief were Robert L. Shapiro, Peter J. Skalaban, Jr., and Michael R. Miner. Of counsel was Glenn S. Greene.
 Harold D. Lester, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, Dc, argued for defendant-appellant. With him on the brief were David W. Ogden, Assistant Attorney General; and David M. Cohen, Director; and Marian E. Sullivan, Attorney. Of counsel on the brief were Marc Johnston, L. Dow Davis, IV, and Jane K. Taylor, Attorneys, Office of General Counsel, Department of Energy, of Washington, Dc.
 Before Mayer, Chief Judge, Friedman, Senior Circuit Judge, and Newman, Circuit Judge.
 The opinion of the court was delivered by: Friedman, Senior Circuit Judge.
 
 
 1
 In this appeal the United States challenges a decision of the United States Court of Federal Claims that three electric utilities may maintain a damage suit based on the government's alleged breach of a 1983 contract with the utilities by which the government agreed, beginning no later than January 1, 1998, to dispose of the nuclear waste that had been produced at the utilities' nuclear power plant. The government has announced that it will not be able to begin such disposal until at least 2010. The government moved to dismiss the complaint on the ground that the only way the utilities could proceed was by filing an administrative claim with a contracting officer under the contract's disputes provision. The Court of Federal Claims denied the motion, and we affirm.
 
 I.
 
 2
 A. In 1982, recognizing the need to protect the public and the environment by providing for the disposal of the nuclear waste accumulating at civilian nuclear power plants around the country, Congress enacted the Nuclear Waste Policy Act of 1982 ("the Act"), 42 U.S.C. 10101-10270 (1994). Congress recognized that "the Federal Government has the responsibility to provide for the permanent disposal of high-level radioactive waste . . . in order to protect the public health and safety." Id. 10131(a)(4). Congress also provided that the "generators and owners" of the nuclear waste should bear "the costs of such disposal" and "have the primary responsibility to provide for [and] to pay the costs of, the interim storage of such waste." Id. 10131(a)(4), (5).
 
 
 3
 The Act authorized the Secretary of the Department of Energy ("the Department") to enter into contracts with utilities for the disposal of spent nuclear fuel ("SNF") and high-level radioactive waste. See 42 U.S.C. 10222(a)(1) (1994). The Act effectively made entry into such contracts mandatory for the utilities by prohibiting the Nuclear Regulatory Commission from issuing licenses to any operator who has not "entered into a contract with the Secretary" or who "is [not] actively and in good faith negotiating with the Secretary for a contract." 42 U.S.C. 10222(b)(1)(A) (1994). The Act required that all such contracts "shall provide that" the Department will dispose of the waste "beginning not later than January 31, 1998." Id. 10222(a)(5)(B).
 
 
 4
 The Department implemented that requirement by promulgating a Standard Contract for Disposal of Spent Nuclear Fuel, 10 C.F.R. 961.11 (1983).
 
 
 5
 The three appellants-Maine Yankee Atomic Power Company, Connecticut Yankee Atomic Power Company, and Yankee Atomic Electric Company (collectively "Yankee")-owned and operated a nuclear power plant. They have shut down this plant and begun to dismantle it. The main remaining part of this process is the disposal of spent nuclear fuel currently stored on the site.
 
 
 6
 The standard contract established the fees the utilities were to pay for the disposal service. These included a one-time fee, based on the amount of electricity generated prior to April 7, 1983, and an ongoing fee, based on the amount of electricity generated thereafter. Because it had closed its reactor prior to that date, Yankee had to pay only the one-time fee-more than twenty-two million dollars-which it did upon execution of the contract.
 
 
 7
 As the Act required, the contract (article II) obligated the Department to take title to, transport, and dispose of the nuclear waste stored at Yankee's facility beginning "not later than January 31, 1998."
 
 
 8
 The contract also contains several provisions dealing with delays, remedies and disputes, which are described in detail in part II, below. In brief, they provide that neither the government nor the utility "shall be liable under this contract for damages caused by failure to perform its obligations hereunder, if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform" (article IX.A); that in the case of "any delay in the delivery, acceptance or transport of SNF . . . to or by DOE caused by circumstances within the reasonable control of either the Purchaser or DOE or their respective contractors or suppliers, the charges and schedules specified by this contract will be equitably adjusted to reflect any estimated additional costs incurred by the party not responsible for or contributing to the delay" (article IX.B); and that "[e]xcept as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer" (article XVI). The contract also provides that "[n]othing in this contract shall be construed to preclude either party from asserting its rights and remedies under the contract or at law" (article XI).
 
 
 9
 B. In 1994, the Department announced that it could not begin disposing of nuclear waste by January 31, 1998, as the contract required, because the repository it planned to build to store the waste would not be available until at least 2010. See Notice of Inquiry, 59 Fed. Reg. 27,007, 27,007-08 (1994). Even that date, the government has admitted, is "up in the air." One year later, in its "Final Interpretation of Nuclear Waste Acceptance Issues," the Department stated that "it does not have an unconditional statutory or contractual obligation to accept nuclear waste beginning January 31, 1998 in the absence of a repository or interim storage facility constructed under the Act." 60 Fed. Reg. 21,793 (1995). The Department has not yet accepted any waste from Yankee or any other utility.
 
 
 10
 Several utilities, not including Yankee, filed suit under the Act, 42 U.S.C. 10139, challenging this Final Interpretation in the United States Court of Appeals for the District of Columbia Circuit. That court held that the January 31, 1998 deadline was not conditioned on the availability of a repository, and vacated the Final Determination. See Indiana Michigan Power Co. v. United States, 88 F.3d 1272 (D.C. Cir. 1996). In response to this decision, the Department notified the utilities that it would not begin disposing of waste by the deadline. Citing the lack of a permanent repository or temporary storage facility, the Department characterized this failure to perform as an "unavoidable delay" under the contract, which was therefore not compensable.
 
 
 11
 A group of utilities, including Yankee, filed in the District of Columbia Circuit a petition for mandamus ordering the Department to meet the contractual deadline. The court refused to so order, stating that, if there were a delay, the utilities "must pursue the remedies provided in the Standard Contract in the event that DOE does not perform its duty to dispose of the SNF by January 31, 1998." Northern States Power Co. v. Department of Energy, 128 F.3d 754, 760 (D.C. Cir. 1997). The court, however, issued a writ of mandamus prohibiting the Department from relying on the unavoidable delays provision of the contract:
 
 
 12
 [W]e preclude DOE from concluding that its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim.
 
 
 13
 This necessarily means, of course, that DOE not implement any interpretation of the Standard Contract that excuses its failure to perform on the grounds of "acts of Government in either its sovereign or contractual capacity." 10 C.F.R. 961.11, Art. IX.A.
 
 
 14
 Id. at 760.
 
 
 15
 C. Shortly after the court of appeals took that action, Yankee filed the present suit in the Court of Federal Claims. Count I of Yankee's four-count complaint alleged a "Partial Breach of Contract" by the Department's "default on its contractual obligation to promptly dispose of Yankee Atomic's SNF. . . , [a]s a result [of which], Yankee Atomic has incurred and will continue to incur additional costs associated with its extended storage of Yankee Atomic's SNF." Count II alleged that the Department had "breached" its "implied duty of good faith and fair dealing . . . by failing and refusing to dispose of Yankee Atomic's SNF, by failing and refusing to take appropriate steps to ensure that DOE would be able to dispose of Yankee Atomic's SNF, by failing and refusing to approve Yankee Atomic's delivery commitment schedules as proposed or to give priority to SNF from Yankee Atomic's shutdown plant, and by otherwise unreasonably failing to perform its duties under the contract." Count III asserted that the Department's "failure to dispose of Yankee Atomic's SNF" constituted a taking of Yankee's property for which it was entitled to just compensation. Count IV alleged that "[b]y requiring Yankee Atomic to bear costs that are the government's statutory financial responsibility, the government has caused an illegal exaction of those costs from Yankee Atomic."
 
 
 16
 The government moved to dismiss all four counts, and Yankee cross-moved for partial summary judgment on Count I. The government contended that the Department's failure to meet the deadline was, at most, an avoidable delay for which the contract provided the remedy of an equitable adjustment; and that the claim was one "arising under the contract" and therefore was subject to the Disputes Clause, which requires filing an administrative claim with the contracting officer. The government argued that Counts II through IV were "subsumed by [Yankee's] mandatory administrative claim" under Count I.
 
 
 17
 The court denied the government's motion to dismiss Counts I-III, granted the government's motion to dismiss Count IV (a ruling that Yankee has not here challenged, and which we therefore do not discuss further), granted Yankee's motion for partial summary judgment on Count I, and certified the question whether Yankee could maintain the suit without first exhausting its administrative contractual remedies for interlocutory review, pursuant to 28 U.S.C. 1292(d)(2). See Yankee Atomic Elec. Co. v. United States, No. 98-126C (Fed. Cl. June 18, 1999).
 
 
 18
 With respect to Count I, the court first held that the government's failure to meet the January 1998 deadline to begin removing the atomic waste "falls under the plain, broad language in [the avoidable delays clause]." Yankee Atomic Elec. Co. v. United States, 42 Fed. Cl. 223, 232 (1998). It rejected Yankee's argument that that clause applies only to delays in ongoing performance, not to the government's complete failure to begin disposing of SNF by the deadline, because "[t]he plain language of the clause covers `any delay' in acceptance of SNF." Id. at 231. The court then held, however, that Yankee's remedies under the contract would not provide Yankee with complete relief for the government's alleged breach of the contract, and that "Yankee's breach claim is not redressable" under the contract. Id. at 235.
 
 
 19
 Having ruled that Yankee's breach of contract claim was properly before it, the court granted Yankee's motion for partial summary judgment on Count I. The court stated that Indiana Michigan had ruled that the Department was obligated "without qualification or condition" to begin disposing of the nuclear waste by January 31, 1998. The court also stated that "[i]t is undisputed that Yankee has paid all the contract fees and . . . that DOE has not begun . . . disposing of Yankee's SNF. Accordingly, DOE has breached the contract." Id. The court rejected the government's argument "that since DOE's nonperformance is cognizable as an avoidable delay under Article IX.B it cannot be a breach." Id. Nothing in the contract, the court responded, "gave DOE the right to unilaterally postpone its unconditional obligations under Article II . . . even though it is cognizable as an avoidable delay and may, in some cases, be redressable under Article IX.B." Id.
 
 
 20
 In denying the government's motion to dismiss Counts II and III, the court found that no provisions of the contract, including the avoidable delays provision, cover a claim for breach of the implied duty of good faith and fair dealing, or a taking claim. Thus, since neither claim "ar[o]se under the contract," neither was "subject to administrative resolution under the disputes clause."
 
 
 21
 D. In another case involving a similar breach of contract claim, also on appeal to this court, another judge of the Court of Federal Claims reached the opposite conclusion. In Northern States Power Co. v. United States, No. 99-5096, decided simultaneously with this case, the court dismissed the utility's suit, holding that the plaintiff was required first to exhaust its administrative remedies under the contract.
 
 II.
 
 22
 The contract in this case contains the following disputes clause (article XVI):
 
 
 23
 Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer. . . . The decision of the Contracting Officer shall be final and conclusive unless within ninety (90) days [the Purchaser appeals the decision] to the DOE Board of Contract Appeals (Board). The decision of the Board shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith or not supported by substantial evidence.
 
 
 24
 This clause is substantially the same as the standard disputes clause used in government contracts prior to the Contract Disputes Act of 1978. 41 U.S.C. 601-613 (1994). The government did not use the disputes clause of the latter because that Act does not cover the furnishing (as distinguished from the procurement) of services by the government. See 41 U.S.C. 602(a); 48 Fed. Reg. 16595 (April 18, 1983).
 
 
 25
 A. Where a federal contract contains such a disputes clause, and also provides a specific administrative remedy for a particular dispute, the contractor must exhaust its administrative contractual remedies prior to seeking judicial relief. See McKart v. United States, 395 U.S. 185, 193 (1969) ("The doctrine of exhaustion of administrative remedies . . . provides `that no one is entitled to judicial relief . . . until the prescribed administrative remedy has been exhausted'" (quoting Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50-51 (1938)); Crown Coat Front Co. v. United States, 386 U.S. 503, 512 (1967) (A government "contractor must seek the relief provided for under the contract or be barred from any relief in the courts."); United States v. Joseph A. Holpuch Co., 328 U.S. 234, 239-40 (1946) (The remedies available under the disputes clause in a government contract are "exclusive in nature. Solely through its operation may claims be made and adjudicated as to matters arising under the contract. . . . And in the absence of some clear evidence that the appeal procedure is inadequate or unavailable, that procedure must be pursued and exhausted. . . ." (citations omitted)); Paragon Energy Corp. v. United States, 229 Ct. Cl. 524, 525 (1981) ("It has long been settled that if a Government contract provides relief for a particular dispute, the standard disputes clause requires the contractor to present the claim administratively before suit can be brought."); Schlesinger v. United States, 383 F.2d 1004, 1007 (Ct. Cl. 1967) ("Ever since United States v. Blair, 321 U.S. 730 . . . (1944), it has been established doctrine that literal adherence to the terms of the [pre-CDA] `disputes' clause is essential to the disposition of all questions `arising under' a standard Government contract.").
 
 
 26
 The question, therefore, is whether Yankee's breach of contract claim is one "arising under" the contract-that is, whether the contractual provisions would provide adequate relief for this "particular dispute." Paragon, 229 Ct. Cl. at 525; see also Edward R. Marden Corp. v. United States, 442 F.2d 364, 366-67 (Ct. Cl. 1971) ("[T]o the extent complete relief is available under a specific provision of the contract, a controversy is regarded as . . . arising `under the contract'"); Len Co. & Assoc. v. United States, 385 F.2d 438, 442 (Ct. Cl. 1967) ("To the extent that complete relief is available under a specific provision-i.e., the claim is both cognizable under and adjustable by the terms of the contract, . . . the controversy arises under the contract and is subject to initial administrative resolution as provided in the normal `Disputes' article."). "Categorization of the claim-`arising under' the contract, or breach of contract-depends upon the particular clause, its words and intent." Id. at 444.
 
 
 27
 B. The government relies on the avoidable delays clause of the contract which, as noted, provides:
 
 
 28
 In the event of any delay in the delivery, acceptance or transport of [SNF] to or by DOE caused by circumstances within the reasonable control of either the Purchaser or DOE or their respective contractors or suppliers, the charges and schedules specified by this contract will be equitably adjusted to reflect any estimated additional costs incurred by the party not responsible for or contributing to the delay.
 
 
 29
 Stressing that this provision covers "any" delay in the "acceptance" of nuclear waste "by" the Department, the government contends that its failure to meet its contractual obligation to begin disposing of such waste by January 1998, constituted a "delay in the delivery, acceptance or transportation" of nuclear waste under that provision. Although this may be a possible interpretation and application of the provision, it is neither plausible nor persuasive, and certainly is not preferred.
 
 
 30
 The provision is not a general one covering all delays, but a more limited one dealing with specified kinds of delays, namely, those "in the delivery, acceptance or transport" of nuclear waste. These involve particular delays involving individual contractors. They are the kind of delays that routinely may arise during the performance of the contract. For them to arise, however, the parties must have begun performance of their obligations relating to disposal of the nuclear waste.
 
 
 31
 Yankee's claim against the government is far broader than one for improper delays by the Department in performing its contractual obligations. Yankee contends that the government breached a critical and central obligation of the contractthat it begin disposal of nuclear waste by January 1, 1998. Congress found this objective so important when it promulgated the Act that it took the unusual action of specifying that all the contracts must contain this explicit requirement. The breach involved all the utilities that had signed the contract-the entire nuclear electric industry. The language of the avoidable delays provision of the contract cannot properly be read to cover Yankee's claim.
 
 
 32
 Further support for this conclusion is found in the limited nature of the relief available under that provision. It provides that in the event of such delay "the charges and schedules specified by this contract will be equitably adjusted to reflect any estimated additional costs incurred by the party not responsible for or contributing to the delay." Yankee seeks as damages the additional expenses it incurred in continuing to store the nuclear waste past the date on which the Department was obligated to remove it. An equitable adjustment in the contractual "charges and schedules" hardly serves as an appropriate basis for determining such damages. Rather, it appears to be a simple method for making adjustments to reflect delays during the performance of the contract.
 
 
 33
 Moreover, equitable adjustment of the contractual schedules for removal of the nuclear waste would provide virtually no basis for compensating Yankee for any damages it may have sustained from the Department's failure to perform its contractual obligations. At present there are no schedules containing specific dates for disposing of the waste of particular companies. It is uncertain when they will be adopted and to what extent, if any, they will, or could effectively reflect the Department's breach of the contract.
 
 
 34
 Indeed, it is unclear whether Yankee's contractual charges could be adjusted under the excusable delays provision. As noted, because Yankee had ceased to operate its nuclear power plant prior to the effective date of the Act, it was required to pay only a single fee for the electricity it had generated prior to that date, which it did upon execution of the contract. The contract states that, unlike the continuing fees for electricity generated after the effective date of the Act, for which prospective adjustments may be made, the one time fee "shall not be subject to adjustment" (article VIII.A.2, 4). Perhaps this provision would not bar a retroactive reduction of the fee, but the very question itself suggests the inapplicability of the excusable delay provision to Yankee's claim.
 
 
 35
 Our discussion of the limited relief available under the excusable delays provision also leads to the conclusion that "complete relief" would not be available for Yankee under that provision, so that Yankee is not precluded from seeking judicial relief by its failure to invoke the contract's disputes clause. Although the government characterizes Yankee's position that complete relief would not be administratively available as speculative, that characterization would more appropriately be applied to the government's contention that such relief would be adequate. The short of the matter is that the narrow specified relief available under the excusable delays provision would fall far short of the relief necessary adequately to compensate Yankee for the damages it alleges it suffered from the government's breach of the contract.
 
 III.
 
 36
 Our conclusion that Yankee may maintain its breach of contract claim in Count I also results in affirmance of the Court of Federal Claims' denial of the government's motion to dismiss Counts II and III. Those two counts, for breach of the government's duty of good faith and fair dealing and for a taking of Yankee's property without just compensation, respectively, cannot be viewed as constituting avoidable delays under that clause.
 
 
 37
 Indeed, the government's only basis for challenging the Court of Federal Claims' refusal to dismiss those two counts is that in asserting them Yankee merely "renam[ed] their contract claim" and cannot "avoid their contracts' administrative exhaustion requirement" by so doing. Our holding that Yankee is not required to invoke the contract's disputes clause before bringing suit under Count I fully answers the government's contention.
 
 IV.
 
 38
 In challenging the Court of Federal Claims grant of partial summary judgment in Yankee's favor on Count I, the government once again argues that the court should have dismissed that count because of Yankee's failure first to proceed under the contract's disputes clause. The government does not, and could not, deny that it failed to meet the contractual requirement to begin accepting nuclear waste no later than January 31, 1998.
 
 
 39
 "Failure to perform a contractual duty when it is due is a breach of the contract." Winstar Corp. v. United States, 64 F.3d 1531, 1545 (Fed. Cir. 1995), aff'd 518 U.S. 839 (1996). As the Court of Federal Claims noted, the parties do not dispute "that Yankee has paid all the contract fees and . . . that DOE has not begun accepting, transporting, and disposing of Yankee's SNF. Accordingly, DOE has breached the contract." Yankee Atomic, 42 Fed. Cl. at 235.
 
 CONCLUSION
 
 40
 The judgment of the Court of Federal Claims denying the government's motion to dismiss Counts I, II, and III and granting partial summary judgment for Yankee on Count I, is AFFIRMED.