**CONSUMERS ENERGY COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 02–1894 C.**

United States Court of Federal Claims.

July 1, 2003.

Thomas O. Mason, Williams Mullen, McLean, Virginia, Harvey J. Messing, Jeffrey S. Theuer, Loomis, Ewert, Parsley, Davis, and Gotting, P.C., Lansing, Michigan, David A. Mikelonis, Arunas Udrys, Jackson, Michigan, for Plaintiff.

Harold D. Lester, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant, with whom were David M. Cohen, Director, Robert D. McCallum, Jr., Assistant Attorney General; and Marc Johnston and Jane K. Taylor, Office of General Counsel, United States Department of Energy, of counsel.

## OPINION

DAMICH, Chief Judge.

### I. Introduction

This case is one of 21 unconsolidated cases filed to date by nuclear utilities with the Court of Federal Claims regarding Defendant's compliance with the "Standard Contract"[1] issued pursuant to the Nuclear Waste Policy Act of 1982 (NWPA), 42. U.S.C. §§ 10101–10270, for the Government's acceptance, transportation, storage, and disposal of spent nuclear fuel (SNF) and other high-level radioactive waste.

In January of 2003, Defendant in the instant case filed a motion to dismiss Counts III, "Taking Without Just Compensation," and IV, "Illegal Exaction," of Plaintiff's complaint. Briefing on this motion was completed by the parties by the end of March 2003. On April 16, 2003, however, pursuant to a joint status report that the Court ordered of all the SNF parties, this Court identified six "lead" or "accelerated" cases for resolution of certain cross-cutting dispositive motions and ordered the remaining cases stayed unless affirmatively ordered to proceed by the presiding judge in any individual case. Although the "accelerated" cases did not include the instant case, this Court determined that it would hear oral argument on the Government's motion to dismiss Plaintiff's illegal exaction count and it is that issue which the Court determines herein.

For the reasons stated below, the Court hereby **GRANTS** Defendant's motion to dismiss Court IV, "Illegal Exaction," of Plaintiff's complaint.

### II. Background

Consumers Energy is a utility company organized and incorporated in Michigan. It owns the Big Rock Point Nuclear Plant (Big Rock) in Charlevoix, MI, which operated until its shutdown in August 1997. Big Rock's SNF is being transferred to dry cask storage on site and the power generation facility is scheduled for dismantling. The utility also owns the Palisades Nuclear Plant (Palisades), near Covert, MI, which continues to operate and generate SNF. The Palisades SNF in stored in its spent fuel pool and in dry cask storage on site.

In the NWPA, Congress addressed the "national problem" of the accumulation of SNF from domestic sources. *See Northern States Power Co. v. United States Department of Energy*, 128 F.3d 754, 756 (D.C.Cir. 1997). According to Plaintiff, the Act was passed "in furtherance of the government's policy that the permanent storage and/or disposal of SNF should be controlled by the Federal government, and that such storage and/or disposal should occur at a repository owned and operated by the government." Pl.'s Resp. to Def.'s Mot. to Dismiss at 2. The NWPA itself addressed the basic terms of the Standard Contract which the Secretary of the Department of Energy (DOE) was directed to reach with the individual SNF utilities by the end of June 1983.[2] The Act expressly provided that

> "Contracts entered into under this section shall provide that— ... (B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subchapter."

42 U.S.C. § 10222(a)(5)(B). *See also Northern States*, 128 F.3d at 756.

Thus, in order to fund the Government's obligation under the Standard Contract to accept and store SNF, the NWPA established that the costs thereof are to be paid by the utilities through payments into a Nuclear Waste Fund (NWF) administered by DOE. 42 U.S.C. §§ 10131, 10222. The utilities have paid a one-time fee based on the amount of their nuclear-generated electricity prior to January 31, 1998, and pay an ongoing fee based on the amount of power generated thereafter. "DOE's duty to dispose of the SNF in a timely manner is 'in return for' the payment of fees into the Nuclear Waste Fund." *Northern States*, 128

---

1. "Standard Contract for the Disposal of Spent Nuclear Fuel And/Or High–Level Radioactive Waste," published at 10 C.F.R. § 961.11.

2. Consumers Energy executed its version of the Standard Contract with DOE on June 3, 1983.

F.3d at 757. Pursuant to its contract with DOE, Plaintiff has already paid approximately $70 million into the NWF.[3]

In 1996, however, DOE advised the SNF utilities that it would not be able to comply with the statutory deadline of January 31, 1998, and that the proposed Yucca Mountain, NV, permanent disposal site would not be available until at least 2010. *Id.* Thus, since January 31, 1998, in light of the Government's failure to meet its obligation to accept, store, and dispose of the SNF, Plaintiff has had to continue to store its own nuclear waste on-site, and incur the costs thereof. These post-January 31, 1998, SNF storage costs, as distinct from the fees paid under the Standard Contract, are the subject of Plaintiff's illegal exaction claim.

## III. Discussion

■ The case law on illegal exaction is relatively straightforward. A claim for illegal exaction will properly lie before the Court of Federal Claims where "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum ..." and where the claim "assert[s] that the value sued for was improperly paid, exacted, or taken from the claimant *in contravention of the Constitution, a statute, or a regulation.*" *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 372 F.2d 1002, 1007 (1967) (emphases added) (cited with approval in *Aerolineas Argentinas v. United States,* 77 F.3d 1564, 1572–73 (Fed.Cir.1996)). *See also Crocker v. United States,* 37 Fed.Cl. 191, 197 (1997) (one type of *noncontract*-based money claim envisioned by the Tucker Act is where "the Government, *under color of statute,* demands and receives money from the claimant" and the parties disagree whether the statute requires such payment) (emphasis added).

In *Aerolineas Argentinas,* the Court of Appeals for the Federal Circuit further noted that the amount exacted need not necessarily have been paid directly to the government. In that case, the Immigration and Naturalization Service required airlines to pay the costs of detention, housing, and meals, pending the resolution of asylum claims, for aliens without entry documents who arrived in the United States via the plaintiffs' planes. The Court held that, if the airlines made payments that by law were the obligation of the INS, "the government has 'in its pocket' money corresponding to the payments that were the government's statutory obligation." *Aerolineas Argentinas,* 77 F.3d at 1574. "The amount exacted and paid may be recovered whether the money was paid directly to the government, or was paid to others at the direction of the government to meet a governmental obligation." *Id.*

■ The question in this case is not one of subject matter jurisdiction, but one of failure to state a claim. According to Defendant, the Government's obligation to take over storage and disposal of SNF was pursuant to *contract* only and therefore there is no "illegal exaction" based on *statute or regulation,* a necessary prerequisite (Def.'s Mot. to Dismiss at 22: Count IV "Legally Deficient Because It Is Contractually Based."). Plaintiff, on the other hand, argues that the NWPA and its regulatory embodiment *obligated* Consumers Energy to agree to the Standard Contract. "[T]he execution of the Standard Contract was not voluntary on the part of Consumers Energy." Pl.'s Resp. at 17. Even so, in the Act itself, the Government committed itself to the responsibility for SNF storage after January 31, 1998 ("[T]he language in the Standard Contract promulgated by the DOE is in part a recitation of the statutory duty." Pl.'s resp. at 17). Thus, according to Plaintiff, its costs for SNF storage after January 1998 qualify as exactions improperly required to meet a governmental obligation.

While the Court recognizes that the NWPA stipulated the essential terms of the Standard Contract, nevertheless the Act is explicit that the Government's obligation to assume responsibility for storage and disposal of SNF "beginning not later than January 31, 1998," was pursuant to "*Contracts* entered into under this section ..." § 10222(a)(5) (emphases added). Plaintiff

---

**3.** Prior to 1983, the storage or disposal of spent nuclear fuel, and the costs thereof, was the obligation of the individual utilities. Def.'s Mot. to Dismiss at 3.

thus has it backwards: rather than the Standard Contract being a recitation of a statutory duty, the statute is a prescription to undertake a contractual obligation.

Defendant makes notable points that "the NWPA did not create any obligation that runs to Consumers, *absent Consumers' execution of a contract with DOE,*" Def.'s Reply at 5 (emphasis added); that the Act simply authorized the DOE Secretary "to enter into contracts ... for the acceptance of title, subsequent transportation, and disposal of such [SNF]," 42 U.S.C. § 10222(a)(1); and that the Secretary was expressly barred under the Act from responsibility for disposal of SNF "unless the generator or owner of such [SNF] has entered into a contract" by not later than June 30, 1983. 42 U.S.C. § 10222(b)(2).

The parties' arguments on the primary question whether the NWPA itself established a governmental obligation have also raised what this Court sees as, at best, a tangential question whether execution of the Standard Contract was voluntary or mandatory. Nevertheless, the mandatory aspect of the Standard Contract warrants review herein.

Defendant argues that the NWPA itself did not mandate that Consumers Energy enter into the Standard Contract or pay fees into the NWF. "Specifically, the NWPA, in and of itself, does not require Consumers or any commercial nuclear utility to pay fees into the NWF." Def.'s Reply at 6. The Act merely prohibited the issuance or renewal of a license to operate a nuclear power plant to any utility that did not sign the Standard Contract. 42 U.S.C. § 10222(b)(1)(A). Thus, Defendant belittles Plaintiff's claim that its signing of the Standard Contract was not voluntary:

Although Consumers may have disliked the requirement to enter into a contract if it wanted to retain its license to operate a nuclear power plant, see 42 U.S.C. § 10222(b)(1), a choice between unpleasant alternatives does not constitute coercion or duress that could invalidate an agreement. Def.'s Reply at 8.

This argument is superficially appealing. "Economic conditions and financial concerns alone are not enough" to demonstrate coercion or duress. *Henderson County Drainage Dist. No. 3 v. United States,* 53 Fed.Cl. 48, 56 (2002) (citing *Adler Constr. v. United States,* 191 Ct.Cl. 607, 423 F.2d 1362, 1364–65 (1970)). Further, even if Consumers Energy could show duress, such a showing would underlie a claim for a voidable contract, *see Restatement (Second) of Contracts* §§ 174–77, at 473–92 (1981), but not a claim for illegal exaction. Plaintiff's fees would be recoverable under traditional contract damages principles.

The Government, however, is overstating Plaintiff's claim on this issue. Plaintiff is not arguing that its contract with DOE is or was invalid, it is not arguing coercion or duress, and it is not seeking to void the contract. Plaintiff is merely arguing instead that the provisions of the NWPA were sufficiently mandatory in effect that the Act provides the necessary statutory foundation for a claim of illegal exaction. "[T]he DOE's duty is statutory, in addition to contractual ..."[4] Pl.'s Resp. at 17.

On the posture of the Standard Contract, the D.C. Circuit observed that the NWPA *"mandates* that DOE assume a *contractual* obligation to start disposing of the SNF by January 31, 1998." *Northern States Power Co.,* 128 F.3d at 757 (emphases added).[5]

4. This argument, however, that the Government's obligation is statutorily founded was flatly rejected in *Yankee Atomic Electric Co. v. United States,* 42 Fed.Cl. 223, 237 (1998), *aff'd on other grounds sub nom. Maine Yankee Atomic Power Co. v. United States,* 225 F.3d 1336 (Fed.Cir. 2000):

Yankee's illegal exaction claim fails because the duty on which claim is based is contractual, not statutory. Section 302(a)(5)(B) of the NWPA directed DOE to assume a *contractual* obligation to begin disposing of SNF by January 31, 1998. 42 U.S.C. § 10222(a)(5). As discussed above, DOE has done so through Article II of the Standard Contract. Therefore, while DOE's failure to begin disposing of Yankee's SNF breaches Article II, it does not violate any statutory duty. Thus, Yankee's post–1998 storage costs cannot be recovered on an illegal exaction theory. *Id.* (emphasis in original).

5. The emphatic connotation of the Court's use of the term, "mandates," admittedly is undone by language one page later in the opinion referring

In a similar vein, the D.C. Circuit squarely addressed this aspect of the Standard Contract in a much earlier decision in *Commonwealth Edison Co. v. United States Dep't of Energy*, 877 F.2d 1042 (1989):

> Much in this case turns on whether the Standard Contract is to be interpreted as a contract or a regulation ... Based on the peculiar circumstances of the case before us, *we find that the Standard Contract into which the parties entered should be viewed as a regulation.* Although the statute specifies that the Secretary must 'enter into contracts' in order to 'provide for payment of fees' into the Fund, 42 U.S.C. § 10222, this is a matter of form rather than content.

*Id.* at 1045 (emphasis added).

> More specifically, the court concluded,

> In short, Commonwealth Edison was not free to dispose of its waste in whatever manner it desired; indeed, it had *no real choice* but to agree to whatever terms the federal government offered. This is not, in other words, the typical government contracts situation. The fee paid by utilities into the Fund resembles an assessment or tax more than it does a freely negotiated price. The size of the fee, moreover, is fixed by statute ...."

*Id.* (emphasis added).

The Federal Circuit, too, has recognized that the Act effectively made the terms of the Standard Contract mandatory. In the appeal of the *Yankee Atomic* decision, the Federal Circuit noted,

> The Act effectively made entry into such contracts *mandatory* for the utilities by prohibiting the Nuclear Regulatory Commission from issuing licenses to any operator who has not 'entered into a contract with the Secretary' or who 'is [not] actively and in good faith negotiating with the Secretary for a contract.'

*Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1337 (Fed.Cir.2000) (emphasis added).

to *"contractual* obligations created consistently with the statutory *contemplation* ...." *Northern*

While this Court is obliged to acknowledge the Federal Circuit's recognition of the mandatory nature of the Standard Contract, nonetheless, *absent the execution of the Standard Contract,* there is no provision in the NWPA establishing January 31, 1998, as the deadline for the Government's assumption of the obligation to accept, store, and dispose of SNF. Under the NWPA, the Government did not gratuitously take over the burden of storage and disposal of SNF, but rather assumed the responsibility for that looming national problem *contractually* in return for payment of fees by the nuclear utilities into the NWF sufficient to cover the Government's costs. 42 U.S.C. § 10131(4).

Thus, unfortunately for Plaintiff, while its claim of illegal exaction certainly relates to the NWPA and its implementing regulations (including the Standard Contract), its claim nonetheless founders with respect to the requisite element of monies improperly paid over to the Government, directly or in effect, in contravention of a *statute or regulation.* If, as seems evident, the Government has failed to meet its obligation to assume such storage and disposal as of January 1998, the Government's failure is contractual, not statutory. The Government's obligation was not assumed in a vacuum, but rather in return for, and explicitly on the basis of, execution of the Standard Contract. Plaintiff may have a cause of action for breach of contract, but its claim of illegal exaction is unavailing.

## IV. Conclusion

For the reasons stated above, the Court **GRANTS** Defendant's motion to dismiss Count IV, "Illegal Exaction," of Plaintiff's complaint.

*States,* 128 F.3d at 758 (emphases added).